*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-AA-0765

JOSE SANCHEZ LOPEZ, PETITIONER,

V.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES
(WORKERS' COMPENSATION), RESPONDENT,

and

CRIS & G PAINTING, LLC, INTERVENOR.

On Petition for Review
of a Decision and Order of the District of Columbia
Department of Employment Services Compensation Review Board
(2022-CRB-000038)

(Submitted October 5, 2023                    Decided August 8, 2024)

*Carlos A. Espinosa* and *Ivan M. Waldman* were on the brief for petitioner.

*Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General, filed a Statement in Lieu of Brief in support of respondent.

*Harry A. Suissa* filed a Statement in Lieu of Brief in support of intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and EASTERLY, *Associate Judges*.

EASTERLY, *Associate Judge*: To be entitled to compensation under the District of Columbia Workers' Compensation Act, D.C. Code §§ 32-1501 to 32-1545, a claimant must be an "employee," a term of art under the Act. An "employee" is statutorily defined to include "every person . . . in the service of another under any contract of hire or apprenticeship, written or implied, in the District of Columbia," but not one "engaged in employment that is casual and not in the usual course of trade, business, occupation, or profession of the employer." D.C. Code § 32-1501(9)(E). To determine whether an individual is a statutory employee, the Department of Employment Services ("DOES") has, with this court's acquiescence, employed a "relative nature of the work test" that examines both the nature and character of the claimant's work and the relationship of the claimant's work to the purported employer's business. The aim of this test is to discern where best to allocate the cost of any injury by the putative employee with an eye toward requiring business owners to internalize costs of on-the-job injuries and to provide a safety net to workers.

Although we accept the "relative nature of the work" test to determine whether an individual is an employee or a casual worker (or independent contractor), we conclude that the Compensation Review Board ("CRB") did not in this case apply

the test correctly, overlooked material facts, and erroneously concluded that petitioner Jose Sanchez Lopez was not an employee eligible for workers' compensation benefits. Accordingly, we reverse the denial of Mr. Sanchez Lopez's claim for benefits and remand for further proceedings consistent with this opinion.

## I.     Facts and Procedural History

While performing demolition work for Cris & G Painting at a building on Connecticut Avenue on June 6, 2020, Mr. Sanchez Lopez fell from the near-top of an approximately six-foot-tall ladder. As a result of this fall, Mr. Sanchez Lopez broke his left arm and did not return to work until April 12, 2021. Cristian Sanchez, the owner of Cris & G Painting, continued for a time to pay wages to Mr. Sanchez Lopez after the accident—payment that corresponded with the seven weeks Cris & G Painting was paid by the general contractor, Foundry Construction ("Foundry"), to do work (totaling $72,131.62) at the Connecticut Avenue site. Mr. Sanchez Lopez then filed a claim for temporary total disability benefits from June 7, 2020, to April 12, 2021, and the payment of causally related medical expenses. Foundry Construction[1] applied for a formal hearing.

At the start of the hearing, Foundry and Cris & G Painting acknowledged that

---

[1] Foundry Construction and its insurer, Erie Insurance, settled with Mr. Sanchez Lopez and were subsequently dismissed as parties to this suit.

they were contesting neither the nature and extent of Mr. Sanchez Lopez's disability nor the causal connection between his disability and the work-related accident. Rather, the sole issue they sought to litigate was whether an employer/employee relationship existed between Mr. Sanchez Lopez and Cris & G Painting or Foundry.

Cristian Sanchez testified to the following: he started his business, Cris & G Painting, in 2012 and "almost exclusively" worked with Foundry; his company was "primarily a painting company" but would engage "day[-]labor employees" "whenever [Foundry] . . . request[ed] . . . demolition work"; "the work of demolition [wa]s something occasional, maybe a couple of times a year," that, per an "agreement" with Foundry, he would hire "day labor employees" to do on a "week-to-week" or "day-to-day" basis; and, for painting work, Cris & G "ha[d] a couple of employees that [we]re steady throughout the year" and whom were given 1099 forms for tax purposes.[2]

Regarding his employment relationship with Mr. Sanchez Lopez, Cristian Sanchez testified that he and Mr. Sanchez Lopez had "worked together a few times for a couple of weeks at a time on different occasions" and on those occasions, he would generally pick Mr. Sanchez Lopez up at Langley Park Plaza, "where most of

---

[2] This type of form is "commonly referred to as an 'independent contractor's tax return.'" *Hickey v. Bomers*, 28 A.3d 1119, 1124 n.2 (D.C. 2011).

the day laborers often h[u]ng out, and . . . look[ed] . . . and wait[ed] for work"; Mr. Sanchez Lopez "work[ed] with [Cris & G Painting] only during those times that there was demolition construction, . . . with the exception of perhaps once, where he worked with [the company] in painting" because there was "lots of work that [they] had to do"; "whenever there was demolition work available," Cristian Sanchez "would call [Mr. Sanchez Lopez], and [Mr. Sanchez Lopez] would always be at the plaza," although "sometimes when he was at home [Cristian Sanchez] would swing by and pick him up"; every day Cristian Sanchez had work for Mr. Sanchez Lopez, Cristian Sanchez would pick up Mr. Sanchez Lopez and drive him to the job site; and, on June 2, 2020, Cristian Sanchez hired ten workers, including Mr. Sanchez Lopez, for a demolition project which was estimated to last two to six weeks.

Testifying on his own behalf, Mr. Sanchez Lopez stated that he had "done [demolition] work with [Cris & G Painting] in the past," and also worked "a few days as a helper in painting." For prior jobs, he had worked for Cristian Sanchez for a $140 daily rate, but he negotiated a $150 rate for the demolition project that he worked on from June 2 until the date of his injury. According to Mr. Sanchez Lopez, Cristian Sanchez provided the instructions, tools, and schedule for the June 2020 project. Mr. Sanchez Lopez acknowledged that whenever he was not performing work for Cristian Sanchez, he "would go to the plaza . . . and . . . wait there to see if

someone would come by and provide [him] work for the day." He acknowledged that he was free to "accept or reject" demolition jobs whenever Cristian Sanchez called him. And he testified that Cristian Sanchez had told him "that right after this [June 2020] work project, that there was another building that [they] would move to, [an] apartment building that was coming up."

Adding to this evidentiary picture, counsel for Mr. Sanchez Lopez submitted exhibits reflecting payments by Cris & G Painting to him or on his behalf. These exhibits included checks from June and July 2020, totaling $4,450, checks from January and February 2020 for six weeks of work, totaling $3,620, and receipts for some of Mr. Sanchez Lopez's medical expenses.

Following the hearing, the ALJ issued a compensation order denying Mr. Sanchez Lopez's claim for temporary total disability benefits. Although the ALJ credited both witnesses, she determined that Mr. Sanchez Lopez had failed, under the "relative nature of the work" test, to prove by a preponderance of the evidence that he was an employee of Cris & G Painting within the meaning of the Workers' Compensation Act.[3] Mr. Sanchez Lopez requested review of the ALJ's order by the CRB. The CRB affirmed the order, concluding that "[t]he ALJ applied

---

[3] Accordingly, the ALJ also determined that the remaining issues—whether Foundry is a statutory employer and the amount of Mr. Sanchez Lopez's average weekly wage—were moot.

the correct legal standard to the facts of the case" and that her conclusions were "supported by substantial evidence and consistent with the law." Mr. Sanchez Lopez timely filed a petition for review.

## II.    Analysis

## A. Standard of Review

"Our now-familiar standard of review of agency decisions in workers' compensation cases is governed by the District's Administrative Procedure Act, D.C. Code §§ 2–501, –510, *et seq.* (2001)." *Kelly v. D.C. Dep't. of Emp. Servs.*, 76 A.3d 948, 954 (D.C. 2013) (internal quotation marks and brackets omitted). We review the order and decision of the CRB to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Reyes v. D.C. Dep't of Emp. Servs.*, 48 A.3d 159, 164 (D.C. 2012). But in so doing, we "cannot ignore the compensation order which is the subject of the [CRB's] review." *Wash. Metro. Area Transit Auth. v. D.C. Dep't of Emp. Servs.*, 992 A.2d 1276, 1280 (D.C. 2010). Our principal function is to assure that the DOES "has given full and reasoned consideration to all material facts and issues," *Coder v. D.C. Dep't of Emp. Servs.*, 284 A.3d 770, 774 (D.C. 2022), within the correct legal framework, *Kelly*, 76 A.3d at 954 (explaining that this court must ensure that the agency's findings are supported by "substantial evidence on the record as a whole[]

and . . . [that its] conclusions flow rationally from those findings and comport with the applicable law") (quoting *United Parcel Serv. v. D.C. Dep't of Emp. Servs.*, 834 A.2d 868, 871 (D.C. 2003)).

## B. The Meaning of "Employee" Under the Workers' Compensation Act

To be entitled to compensation under the District of Columbia's Workers' Compensation Act, a claimant must be an "employee." *See* D.C. Code § 32-1503(a). An "employee" is broadly defined under the statute to include "every person . . . in the service of another under any contract of hire or apprenticeship, written or implied, in the District of Columbia," but is then limited by a number of exceptions. D.C. Code § 32-1501(9). As relevant in this case, the Act excepts from its coverage "[a]n employee engaged in employment that is casual and not in the usual course of trade, business, occupation, or profession of the employer." D.C. Code § 32-1501(9)(E).

All states have workers' compensation statutes, and many have confronted the issue of defining who is an employee as distinct from a casual laborer or independent contractor. *See* 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, § 73.01 at 73-1 to 73-2 (2023); 5 *id.* § 60.02 at 60-4. Most states initially employed the "right to control" test—a test that arose at common law to determine when employers should be held liable for the tortious actions of their servants. *See*

5 *id.*, § 60.01 at 60-2 to 60-3. Under this test, the central inquiry was "whether the putative employer ha[d] a right to control the details of the claimant's work." *Munson v. D.C. Dep't of Emp. Servs.*, 721 A.2d 623, 625 (D.C. 1998). But over time, a number of states recognized that the humanitarian and economic considerations undergirding workers' compensation statutes, *see McCamey v. D.C. Dep't of Emp. Servs.*, 947 A.2d 1191, 1196-97 (D.C. 2008), were not well served by looking to whether an employer controlled the details of the work. *See* 5 Larson, *supra*, § 60.04[2] at 60-8; *id.* § 62.01 at 62-2 to 62-4. Consequently, these states "turned . . . to the 'relative nature of the work' test."[4] *Munson*, 721 A.2d at 625; *see also* 5 Larson, *supra*, § 60.05[4] at 60-12. Under this test, "an employment relationship . . . is found" when (1) "the work being done is an integral part of the regular business of the employer" and (2) "the worker, relative to the employer, does not furnish an independent business or professional service." *Munson*, 721 A.2d at 625; *see also Reyes*, 48 A.3d at 164-65 (explaining that this test "requires a

---

[4] Larson's survey of employment tests in the context of workers' compensation law shows that the shift away from the "right to control" test and toward the "relative nature of the work" test is apparent from either explicit adoption in the case law or by statute, or simply the "implications of the actual fact decisions themselves"—i.e., decisions in which "the control test has been unconsciously jettisoned as the primary consideration." 5 Larson, *supra*, § 60.05[4] at 60-12 to 60-13. Thus, Larson acknowledges "that the right to control the details of the work is" ostensibly still "the primary test" for determining a claimant's employment status in many states, even as the degree to which the employer's business relies on the claimant's work appears to be the operative consideration. 5 *id.* § 60.03 at 60-5.

very fact-specific analysis" which considers both "the nature of the claimant's work" and the "relationship between the claimant's work and the employer's work," but ultimately "focuses on whether the worker is hired to do work in which the company specializes").

As indicated, the relative nature of the work test has two parts. The first part focuses on the "nature and character of the claimant's work or business" and requires consideration of three factors: (a) "the degree of skill involved [in the work in question]"; (b) "the degree to which it is a separate calling or business"; and (c) "the extent to which it can be expected to carry its own accident burden." *Gross v. D.C. Dep't of Emp. Servs.*, 826 A.2d 393, 396 n.5 (D.C. 2003); *see also* 5 Larson, *supra*, § 60.05[2] at 60-10. The second part of the test focuses on the relation of the claimant's work to the employer's business and also requires consideration of three factors: (a) "the extent to which [the] claimant's work is a regular part of the employer's regular work"; (b) "whether [it] is continuous or intermittent"; and (c) "whether [its] duration is sufficient to amount to the hiring of continuing services, as distinguished from contracting for the completion of a particular job." *Gross*, 826 A.2d at 396 n.5; *see also* 5 Larson, *supra*, § 60.05[2] at 60-10. "Although several factors are considered under . . . the 'relative nature of the work' test, no one factor is dispositive." *Reyes*, 48 A.3d at 165. In line with the Workers' Compensation Act's goal of "assured compensation," *Ferreira v. D.C. Dep't of Emp. Servs.*

*(Workers' Comp.)*, 531 A.2d 651, 654 (D.C. 1987), the ultimate aim of the test is to provide for fair and efficient adjudication of claims.

In *Munson*, this court identified in a survey of DOES decisions an "uncertainty as to the appropriate standard to apply to make . . . determinations" of whether or not claimants are "employees" within the meaning of the Workers' Compensation Act—the "right to control" or the "relative nature of the work" test—and remanded the case for an authoritative interpretation of the statute by DOES. 721 A.2d at 626-28. DOES adopted a "relative nature of the work" test, *see Gross*, 826 A.2d at 396, and this court has accepted the agency's use of that test, *see id.*; *see also Reyes*, 48 A.3d at 164-65.[5] The issue now before us is whether the DOES ALJ, and by

---

[5] "[W]e have often given deference to the CRB's reasonable interpretation of the workers' compensation statute . . . . Recent decisions of this court, however, have raised questions about the extent to which the CRB is entitled to such deference." *Rieger v. D.C. Dep't of Employment Services*, 316 A.3d 459, 465 (D.C. 2024). The Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2024 WL 3208360 (2024) has added to the uncertainty. *See id.* at \*12 (holding that federal courts reviewing agency action under the APA must "decide legal questions by applying their own judgment," rather than deferring to an agency's interpretation of an ambiguous statute). Here, however, neither party has challenged the agency's use of the "relative nature of the work" test to determine whether a claimant is an "employee" within the meaning of the statute or suggested that DOES should instead be employing the "right to control" or some other test. (Mr. Sanchez Lopez does cite a pre-*Munson* decision in which the CRB found the claim compensable through application of the "right to control" test, but only to support his argument that his demolition work was integral to Cris & G Painting's overall business under the "relative nature of the work" test, and he acknowledges that the "right to control test" is not "the appropriate test to determine Employee/Employer relation[s] in the

extension the CRB reviewing the ALJ's ruling, properly employed the "relative nature of the work" test to Mr. Sanchez Lopez's case.

## C.  Whether Mr. Sanchez Lopez Was an "Employee" under the "Relative Nature of the Work" Test

Addressing the first part of the relative nature of the work test, the DOES ALJ stated:

> [T]here was no testimony regarding any degree of skill that was required to perform the job duties for the demolition project.  Additionally, Claimant did not provide any testimony that he performs any separate calling or business other than what he was hired to do (demolition) for Cris & G Painting, LLC.  There was no testimony that Claimant's demolition work was expected to carry its own accident burden.

After concluding that there was "no testimony" upon which it could rely to assess the first part of the test, the ALJ proceeded to make findings under the second part of the test and appeared to rely exclusively on those latter findings in concluding that Mr. Sanchez Lopez was not an employee.  *See infra*.  This was error for two reasons.

District of Columbia.")  Moreover, we think it plainly correct that the "right to control" test, derived from the different context of vicarious liability for tort claims, should not be employed to identify an "employee" under a remedial statute.

First, the ALJ's formulaic recitation and overly literal application of the factors in one part of a two-part test—without explanation as to how these factors and their perceived lack of relevant evidence should be weighed in conjunction with the second part of the test—was an incomplete analysis. The CRB's pronouncement in its affirmance of the ALJ's decision that "[t]he emphasis . . . should be on the second part of the test" is not reassuring. Although we said in *Reyes* that the first part of the "relative nature of the work" test is generally "accorded less weight," we made clear that DOES must analyze "both parts of the test" before making the determination whether an employer/employee relationship exists. *Reyes*, 48 A.3d at 165.

Second, there *was* testimony in the record that related to the first part of the test—the nature and character of the claimant's work or business—and that testimony weighed in favor of Mr. Sanchez Lopez. Looking to the first factor under this part of the test, the degree of skill involved, Mr. Sanchez Lopez testified that he did demolition work and had helped out with painting work for a daily rate and that when he was not working for Cristian Sanchez he would try to get other work by going to the plaza to see if someone would come by and hire him. This testimony, along with Cristian Sanchez's testimony that he had "an agreement" with Foundry that whenever Foundry needed demolition work to be done he "would go get . . . day[-] labor employees," compelled an inference that Mr. Sanchez Lopez's work did

not require careful vetting and was unskilled.

As for the second and third factors under the first part of the test, the testimony from both Mr. Sanchez Lopez and Cristian Sanchez that Mr. Sanchez Lopez was a day laborer, in conjunction with Mr. Sanchez Lopez's testimony that, when he did do work for Cris & G Painting, Cristian Sanchez picked him up and provided the instructions, tools, and schedule, compelled a finding that Mr. Sanchez Lopez did not have "a separate calling or business" and weighed in favor of concluding that he should not have been expected to carry his own accident burden. *See Reyes*, 48 A.3d at 168 ("The less skilled and less independent the work is, the more likely the worker is an employee and not expected to carry his own accident burden. This is so because skilled or licensed workers who set their own hours and terms can choose what risks they are willing to take on, and are more likely to be independent contractors . . . ." (citing 3 Larson, *supra*, § 60.02 at 60-04 (2011))).

In short, the ALJ's assessment of the first part of the relative nature of the work test was neither supported by substantial evidence nor in accordance with the law and the CRB erred in affirming it.

Turning to the second part of the "relative nature of the work" test, the DOES ALJ found that: Cris & G Painting, LLC, "primarily performs painting and plastering . . . , not demolition work" and Mr. Sanchez Lopez's work "was not a

regular part of Cris & G Painting, LLC['s,] normal job activities"; Mr. Sanchez Lopez had provided no testimony regarding how often he performs demolition work but that the project in this case was "expected to last approximately two weeks"; Mr. Sanchez Lopez "worked for Cris & G Painting, LLC[,] only sporadically and on an as needed basis" and had worked for Cris & G Painting for seven weeks in January and February of 2020 and not again until June 2020; and Mr. Sanchez Lopez "negotiated the amount of money he wanted to be paid." Based on these findings, the DOES ALJ concluded that Mr. Sanchez Lopez was an "intermittent worker for Cris & G Painting, LLC[,] . . . not . . . an employee of Cris & G Painting, LLC." The CRB in turn affirmed the determination that demolition was not "an integral part of Cris [&] G[] Painting's business" and that Mr. Sanchez Lopez was only an "intermittent worker" for the company.

First, we question the DOES ALJ's factual findings about the nature of Cris & G Painting's work, which seemed to ignore part of the testimony and all of the documentary evidence. Cristian Sanchez did testify that the "primary job" of Cris & G Painting is "painting" while "demolition is something occasional, maybe a couple times a year." But he also testified that his company did demolition work for Foundry whenever Foundry needed it and that he had an agreement with Foundry to hire day laborers on a "week-to-week basis" or "sometime[s] . . . just day-to-day," whereby he would get a certain dollar amount for each laborer he recruited. And

Cris & G Painting had the necessary tools to do the demolition work as evidenced by Mr. Sanchez Lopez's testimony that Cristian Sanchez gave these tools to him. Moreover, Mr. Sanchez Lopez's hearing exhibits reflect that Cris & G Painting spent a substantial amount of time doing demolition work for Foundry—six weeks in January and February, all of June, and three weeks in July. In total, Cris & G Painting paid Mr. Sanchez Lopez $8,070 for these demolition projects. And Mr. Sanchez Lopez anticipated more work from Cris & G Painting from another demolition project that was supposed to follow the Connecticut Avenue demolition. All of this evidence compelled a finding that, although this work may not have been the "primary" work of Cris & G Painting, it was within the scope of regular services Cris & G provided to Foundry as its subcontractor. *See* 6 Larson, *supra*, § 73.03[1] at 73-7 ("[N]o matter how brief or sporadic a particular employment may be, it is within the compensation act if it is part of the employer's regular business.").

Second, we question the findings the ALJ made about Mr. Sanchez Lopez's relationship with Cris & G Painting. The ALJ found that Mr. Sanchez Lopez had "previously worked for Cris & G Painting, LLC[,] for 7 weeks in 2020 ending in February"; he "did not work again for Cris & G Painting, LLC[,] until June of 2020"; at that point he "was contracted for the completion of a particular job" that was expected to last approximately two weeks. The DOES ALJ's finding that the demolition project "was expected to last approximately two weeks" is not supported

by the record. During the hearing, Cristian Sanchez was asked how long the project was expected to last and he responded that, although projects "can last anywhere between three, four, up to six weeks," "this specific project . . . lasted six weeks." Counsel for Mr. Sanchez Lopez then asked if Cristian Sanchez had initially "estimated the work to be about two to six weeks," but Cristian Sanchez did not clearly backtrack from his earlier testimony; instead, he responded, "[w]ell, in reality, the answer is no. . . . It all depends." Lastly, although the daily work log submitted by Cris & G Painting ran only from June 2 to June 13, both invoices and checks from Foundry to Cris & G Painting indicated that the project continued well into July—i.e., approximately *seven* weeks. Additionally, the ALJ did not consider Mr. Sanchez Lopez's uncontested testimony that Cristian Sanchez told him "that right after this [Connecticut Avenue] work project, . . . there was another building that we would move to, [an] apartment building that was coming up."

Even assuming that the Connecticut Avenue project was expected to and did last approximately two weeks, the ALJ's conclusion that Mr. Sanchez Lopez's "intermittent," "as needed" work "reflect[ed]" that he "was contracted for the completion of a particular job and not as a regular full time or full duty employee" set the bar too high for establishing "employee" status under the Workers' Compensation Act. In *Reyes*, we held that thirty-two weeks of work over 104 weeks of employment indicated that the alleged employer "did not view Reyes as a one-

time independent contractor and suggest[ed] that . . . [his employer] provided continuous work to Reyes." *Reyes*, 48 A.3d at 168-69. We gave no indication that the facts of *Reyes* constituted the temporal floor, however; to the contrary, we went on to explain that because "[t]he length of employment is indicative of whether the worker's employment is long-term and . . . necessary to the overall productivity of the employer[,] . . . 'very short employments, of a few hours or days, are considered casual, while duration for several weeks or months is usually in itself enough to remove a job from [the casual] category.'" *Id.* at 168 (quoting 4 Larson, *supra*, § 73.02 at 73-3 (2011)).

Although the records of Mr. Sanchez Lopez's intermittent employment spanned only six months, all of his projects were more than "a few hours or days," and his consistent availability for demolition work as needed—as well as his uncontested testimony that Cristian Sanchez told him "that right after this [June] work project, . . . there was another building that we would move to, [an] apartment building that was coming up," which the ALJ did not consider—is indicative of a continuing, not casual, relationship with Cristian Sanchez and Cris & G Painting. *See* 6 Larson, *supra*, § 73.02 at 73-3 (explaining that in assessing whether employment is only casual, "mere brevity is not conclusive, if there is a reasonable probability of regular recurrence or continuance for a substantial period"); *Reyes*, 48 A.3d at 169 nn.6 & 7 (citing non-binding DOES decisions that have found an

employment relationship where claimants were laborers hired intermittently for particular weeks-long projects); *see also Morin v. Harrell*, 164 P.3d 495, 498 n.11 (Wash. 2007) (en banc) (noting that "'casual labor' is limited to work that is irregular, uncertain or incidental in nature and duration" (internal quotation marks omitted)); *cf. Benavidez v. Sierra Blanca Motors*, 959 P.2d 569, 574-75 (N.M. Ct. App. 1998) (holding that an incarcerated laborer's employment—forty hours per week and expected to last a month and a half—was not "irregular, unpredictable, sporadic, and brief," i.e., "casual"); *Winters v. Payne*, 283 A.2d 807, 813 (Md. Ct. Spec. App. 1971) ("While it is true that the claimant's employment was for an indefinite duration and conceivably would have continued for no more than a few days or weeks, this, alone, does not compel a finding that the employment was casual," because employment was "concomitant to and in furtherance of the employer's regular . . . business."). Thus, the ALJ's determination that Mr. Sanchez Lopez was an "intermittent" worker rather than an "employee" was not supported by substantial evidence and did not "flow rationally from [her] factual findings." *Reyes*, 48 A.3d at 169.

The ALJ's assessment of the second part of the relative nature of the work test was like the first, unsupported by substantial evidence and not in accordance with the law and the CRB erred in affirming it. Indeed, "based on our review of the record, we conclude that the evidence in the record clearly and convincingly

supports (not negates) that an employee/employer relationship existed between" Mr. Sanchez Lopez and Cris & G Painting. *See Reyes*, 48 A.3d at 165; *Apartment & Off. Bldg. Ass'n of Metro. Wash. v. D.C. Pub. Serv. Comm'n*, 129 A.3d 925, 930 (D.C. 2016) ("[R]emand is not required in cases where the agency would doubtless reach the same result . . . or [where] it is clear what the agency's decision has to be." (internal quotation marks omitted)).

### III.   Conclusion

For the reasons stated above, we conclude that the CRB erred in affirming the ALJ's compensation order that concluded, based on a flawed application of the "relative nature of the work" test, that Mr. Sanchez Lopez was not an employee within the meaning of the Workers' Compensation Act. We thus vacate the CRB's decision and remand the case for further proceedings consistent with this opinion.

*So ordered*.